IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:23-cv-_____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PETER C. LABOVITZ, | ) | |
| 510 Wolfe Street | ) | |
| Alexandria, VA 22314; | ) | |
| | ) | |
| SHARON M. LABOVITZ, *individually and* | ) | |
| *as Trustee for Sharon McGee Labovitz Trusts 1 and 2,* | ) | |
| 510 Wolfe Street | ) | |
| Alexandria, VA 22314; | ) | |
| | ) | |
| DCI PUBLISHING OF ALEXANDRIA, INC., | ) | |
| 510 Wolfe Street | ) | |
| Alexandria, VA 22314; | ) | |
| | ) | |
| SHARON MCGEE LABOVITZ TRUST 1, | ) | |
| *through its trustee,* Sharon McGee Labovitz; | ) | |
| | ) | |
| SHARON MCGEE LABOVITZ TRUST 2, | ) | |
| *through its trustee,* Sharon McGee Labovitz; | ) | |
| | ) | |
| TARA LLOYD, as Plan Agent for the Labovitz | ) | |
| Collateral Pool, | ) | |
| 510 Wolfe Street | ) | |
| Alexandria, VA 22314 | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

Plaintiff, the United States of America, at the request of the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and at the direction of the Attorney General of the United States, brings this action to collect on the unpaid tax liabilities of Peter C.

17639317.1

Labovitz for which a judgment was entered by this Court in *United States v. Labovitz*, civil no. 1:12-cv-106 on June 11, 2013, and complains as follows:

1.      The United States seeks to set aside various transfers of Peter C. Labovitz's property as fraudulent conveyances, obtain a declaratory judgment that the United States' federal tax liens attach to certain property held directly and indirectly by Sharon McGee Labovitz Trust 1 and Sharon McGee Labovitz Trust 2 (collectively, "the Trusts"); obtain a declaration that DCI Publishing of Alexandria is owned by Peter Labovitz; and obtain a declaration that all encumbrances on the Labovitzes' residence that the Labovitzes may allege to be prior to the federal tax liens and the United States' judgment lien are not enforceable ahead of the liens of the United States, either because they are held by nominees of Peter Labovitz, or have been satisfied or extinguished by lapse of time.

## JURISDICTION & VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1340 and 1345, as well as 26 U.S.C. §§ 7402 and 7403.

3.      Venue is proper in this Court by virtue of 28 U.S.C.§§ 1390 and 1396 because Peter Labovitz resides at 510 Wolfe Street, Alexandria, Virginia 22314 in this judicial district and his tax liability accrued while he resided within this judicial district.

## PARTIES

4.      Plaintiff is the United States of America.

5.      Defendant is Peter C. Labovitz ("Labovitz"), residing at 510 Wolfe Street, Alexandria, Virginia.

6.     Sharon Labovitz is the wife of Peter C. Labovitz.  She is joined as a defendant both in an individual capacity and as a trustee of the Sharon McGee Labovitz Trust 1 and Sharon McGee Labovitz Trust 2 ("the Trusts"), because in both capacities she may claim an interest in the property at issue in this action.  She resides at 510 Wolfe Street, Alexandria, Virginia.

7.     DCI Publishing of Alexandria, Inc. ("DCIA") is joined as a defendant because it may claim an interest in the property at issue in this action.  DCIA is a corporation organized under Delaware law with its principal place of business at 510 Wolfe Street, Alexandria, Virginia.

8.     Sharon McGee Labovitz Trust 1 is joined as a defendant because it may claim an interest in the property at issue in this action.  The Sharon McGee Labovitz Trust 1 is located at 510 Wolfe Street, Alexandria, Virginia.

9.     Sharon McGee Labovitz Trust 2 is joined as a defendant because it may claim an interest in the property at issue in this action.  The Sharon McGee Labovitz Trust 2 is located at 510 Wolfe Street, Alexandria, Virginia.

10.    Tara Lloyd is the daughter of Peter Labovitz and is joined as a defendant in her capacity as "Plan Agent for the Labovitz Collateral Pool," because she may, in that capacity, claim an interest in the property at issue in this action.  Upon information and belief, Tara Lloyd resides at 510 Wolfe Street, Alexandria, Virginia.

## BACKGROUND FACTS

### *Nature of This Action*

11.    Peter Labovitz owes the United States $3,022,891 in unpaid federal tax liabilities and statutory accruals as of June 30, 2023.  This Court entered a judgment in favor of the United

States and against Peter C. Labovitz on June 11, 2013, in *United States v. Labovitz*, civil no. 1:12-cv-106.

12.     To prevent the United States from foreclosing on his property interests to satisfy the tax liabilities underlying the judgment, Labovitz has orchestrated a series of fraudulent conveyances and nominee transactions to obstruct, hinder, and delay the collection of his tax liabilities.

13.     In 1987, Peter Labovitz established and funded the Trusts purportedly on Sharon Labovitz's behalf.  Sharon Labovitz is the trustee of both Trusts.  Sharon Labovitz is also the sole beneficiary of the Trusts until her death, at which point the property of the Trusts gets distributed to her children or others she has designated by will.

14.     Labovitz has transferred almost all of his property interests to the Trusts, or to other business entities now owned by the Trusts.  These transfers were either: (1) made for little or no consideration, or (2) in exchange for promissory notes or other security interests that Labovitz alleges are worthless.  The transfers give Labovitz the appearance that he has no valuable assets.

*Labovitz's Property: the Labovitz Residence*

15.     The residence that Peter and Sharon Labovitz own, located at 510 Wolfe Street, Alexandria, Virginia is more specifically described as:

> Lot 501 of the Subdivision of ZERELDA C. McCONNELL, as the said Subdivision appears duly dedicated, platted and recorded among the land records of the City of Alexandria, Virginia, on the 31st day of October, 1966, in Deed Book 658, Page 556.

hereinafter referred to as ("the Residence").

16.     Peter Labovitz and Sharon Labovitz purport that the Residence is encumbered by three security interests that have priority over the IRS's tax liens and judgment lien.  The alleged encumbrances are described in detail in counts further below.[1]

17.     To summarize, however, none of the three alleged encumbrances on the Residence that are prior to the Government's liens are valid.

18.     The alleged encumbrances against the Residence are held either directly or indirectly by the Trusts, who do not act like creditors holding liens against Labovitz.  Labovitz has made nominal payments – or no payments at all – on the supposed "debts" that underlie the liens.  In addition, two of the liens have lapsed by the passage of time.  Moreover, the third alleged lien tracks a supposedly growing debt, but this debt was satisfied back in 2006 by paying the lenders using the proceeds from selling some property that served as collateral to the loan.

19.     Despite this, Labovitz claims that the "debts" underlying the three alleged encumbrances on the Residence continue to exist and continue to grow at the interest rates set out in the original debt instruments.

20.     Labovitz claims he is free to use his six-million-dollar residence as he wishes, while maintaining that (1) he has no assets or income with which to pay his federal tax liabilities; and that (2) his house is fully encumbered by ever-growing debts that will consume all equity in the property in perpetuity.

21.     The actions set out in the above paragraphs were taken to avoid payment of Labovitz's tax debts.

---

[1] The three alleged encumbrances are identified in Counts III-V, below, as the Collateral Pool Lien, the Access Bank Note, and the NVR Note.

*Labovitz's Unpaid Tax Liabilities*

22.     The Internal Revenue Service (IRS) assessed civil penalties under 26 U.S.C.

§ 6672 (Section 6672) against Peter Labovitz corresponding to unpaid federal employment taxes

withheld from the wages of the employees of DCI Publishing, Inc. and/or Connection

Publishing, Inc. for the taxable periods ending March 31, 1998; March 31, 2000; September 30,

2000; and December 31, 2000.  These taxes withheld from employee wages are held by

employers as "a special fund in trust for the United States" under 26 U.S.C. § 7501(a), so they

are commonly referred to as "trust fund" taxes.

23.     Peter Labovitz was the President of both DCI Publishing, Inc.[2] and Connection

Publishing, Inc., during the taxable periods identified above.

24.     On August 9, 1999, the IRS assessed Section 6672 penalties against Labovitz for

the taxable period ending March 31, 1998.

25.     On November 13, 2000, the IRS assessed Section 6672 penalties against Labovitz

for the taxable period ending March 31, 2000.

26.     On August 12, 2002, the IRS assessed Section 6672 penalties against Labovitz for

the taxable period ending September 30, 2000.

27.     On August 12, 2002, the IRS assessed Section 6672 penalties against Labovitz for

the taxable period ending December 31, 2000.

28.     By reason of the assessments described in paragraphs 24 – 27, federal tax liens

arose on the dates of those assessments pursuant to 26 U.S.C. §§ 6321 and 6322 and attach to all

property and rights to property owned or thereafter acquired by Labovitz.

---

[2] DCI Publishing, Inc. is a different entity from DCI Publishing of Alexandria, Inc., though both were newspaper management companies. The latter entity is what is referred to as "DCIA" throughout this Complaint. The former is always referred to by its full name, DCI Publishing, Inc.

29.     The IRS filed and re-filed notices of the federal tax liens corresponding to the assessments described in paragraphs 24 – 27.

30.     The notices of the federal tax liens were originally filed on September 25, 2002.

31.     The re-filing deadline for the notices of the federal tax liens corresponding to the assessments in paragraphs 24 and 25 expired, in error.  The IRS filed "revocation of releases" concerning these liens and then re-filed notices of federal tax liens for the assessments in paragraphs 24 and 25 in August 2011.

32.     The IRS re-filed notices of the federal tax liens corresponding to the assessments described in paragraphs 26 and 27 in June 2012.

33.     Related to the assessments described in paragraphs 24 through 27, this Court in civil action no. 1:12-cv-106 entered judgment on June 11, 2013, in favor of the United States and against Peter Labovitz for $2 million for unpaid trust fund taxes withheld from the wages of the employees of DCI Publishing, Inc. and/or Connection Publishing Inc. for the taxable periods ending March 31, 1998; March 31, 2000; September 30, 2000; and December 31, 2000. With statutory accruals, the amount owed on the judgment is $3,002,891 as of June 30, 2023.

34.     The United States' abstract of judgment against Labovitz in Case No. 1:12-cv-106 was recorded in the Alexandria land records on June 30, 2016.

35.     No payments have been made to satisfy the judgment or the underlying tax assessments described in Paragraphs 24-27 and 33, above.

*On the eve of Bankruptcy, the Labovitzes transfer millions of dollars of real estate interests for a worthless note*

36.     On June 2, 1998, Peter and Sharon Labovitz filed for bankruptcy (Chapter 11) in the U.S. Bankruptcy Court for the Eastern District of Virginia, case number 98-14213.

37.     Months earlier, in February 1998, the Labovitzes transferred partnership interests in three real estate partnerships, Gadsby Lodging Associates, LLC, Dechantal Associates Limited Partnership, and Station Center Associates Limited Partnership, to the Trusts for a promissory note (the "Labovitz Note") with a face value of over $4 million dollars.

38.     The Labovitz Note's payment terms made it worthless, however.

39.     As described in further detail in Count II, Peter Labovitz himself has acknowledged the Labovitz Note had no "present value" when it was issued and the Bankruptcy Court suggested the Labovitz Note may have been the vehicle of a fraudulent conveyance of valuable property to the Trusts in order to evade Labovitz's creditors.

**COUNT I: DECLARATORY JUDGMENT THAT PETER LABOVITZ HAS 100% OWNERSHIP OF DCIA**

40.     The allegations contained in paragraphs 1 – 39 are restated as if fully set forth herein.

41.     Peter Labovitz owned 100% of the shares of stock in DCIA until he filed for bankruptcy in case 98-14213.

42.     DCIA was a newspaper management company.  Peter Labovitz was the President of DCIA from its inception until at least 2007.

43.     Pursuant to the court-approved second amended plan of reorganization in Peter Labovitz's bankruptcy proceeding, 98-14213, in May 2000, Peter Labovitz transferred all his stock in DCIA to the Trusts.

44.     Per the order of the bankruptcy court, filed on February 28, 2000 (and entered on Mar. 6, 2000), the DCIA stock remained subject to the claim of the IRS as if it had not been transferred from Labovitz to the Trusts, in the event that Labovitz did not comply with his payment obligations to the IRS under the bankruptcy plan.

45.     Labovitz subsequently failed to complete the plan payments to the IRS.

46.     Therefore, all shares in DCIA are the exclusive property of Labovitz for purposes of this action.

**COUNT II: DECLARATORY JUDGMENT THAT PETER LABOVITZ'S TRANSFER OF HIS INTERESTS IN GADSBY LODGING, DECHANTAL ASSOCIATES, AND STATION CENTER ASSOCIATES WAS A FRAUDULENT CONVEYANCE PURSUANT TO VA. CODE ANN. § 55.1-400 (OR FORMER VA. CODE ANN. § 55-80)**

47.     The allegations contained in paragraphs 1 – 46 are restated as if fully set forth herein.

48.     In February 1998, a few months before entering bankruptcy in June 1998, Peter and Sharon Labovitz purportedly sold the following partnership interests to the Trusts in exchange for a $4,038,990 Note ("the Labovitz Note"):

  a.  A 45.1% limited partnership interest in Station Center Associates Limited Partnership;

  b.  A 99% limited partnership interest in Dechantal Associated Limited Partnership; and

  c.  A 12.278% Class B membership interest in Gadsby Lodging Associates, L.L.C.

(collectively the interests in parts a, b, and c are referred to as "the Partnership Shares").

49. At the time of the February 1998 transfer, the partnerships described in the immediately preceding paragraph owned, or soon thereafter acquired, at least the following property:

      a. Station Center Associates Limited Partnership owned an office building at 1700 Diagonal Road, Alexandria VA, 22314;

      b. Dechantal Associated Limited Partnership owned real property at 1604 – 1614 King Street, Alexandria, VA 22314; and

      c. Gadsby Lodging Associates, L.L.C. owned the Old Town Alexandria Holiday Inn Select at 480 King Street, Alexandria, VA 22314.

50. When Peter and Sharon Labovitz conveyed the Partnership Shares to the Trusts in exchange for the Labovitz Note, Labovitz was insolvent.

51. When Peter and Sharon Labovitz conveyed the Partnership Shares to the Trusts in exchange for the Labovitz Note, Labovitz was aware that his companies were not presently paying their federal employment taxes and that he could face substantial personal liability on account of those unpaid tax liabilities.

52. At the time of the transfer of the Partnership Shares, Labovitz also had existing federal tax liabilities. For instance, he owed federal income taxes for 1993.

53. The transfer of the Partnership Shares in exchange for the Labovitz Note was intended to remove signs of Labovitz's ownership of the Partnership Shares, in an attempt to impede Labovitz's creditors, including the United States, from collecting his unpaid debts.

54. The Labovitz Note promises annual interest of 6% (after the first 12 months of 0% interest) and requires interest to be paid "from time to time" when demanded.

55. Labovitz has never demanded payment of the 6% interest from the Trusts.

56.     Despite the Labovitz Note maturing in 2018, Labovitz has never sought to collect payment of any principal or interest from the Trusts based on the Labovitz Note.

57.     Labovitz has stated in sworn deposition testimony on April 11, 2013, and in sworn interrogatory responses from October 10, 2018, that the Labovitz Note had no "present value" at its issuance.

58.     In an adversary proceeding (E.D. Va. Bankr. 98-1297) within the bankruptcy, Labovitz asserted that the Labovitz Note had no present value.

59.     Labovitz subsequently testified that the note is worthless. *See* docket no. 124 (Memorandum containing findings of law and fact) in ED. Va. Bankr. no. 98-1297.

60.     The bankruptcy court observed, regarding the Labovitz Note, "It may be that [Peter and Sharon Labovitz] have made a fraudulent conveyance in transferring these assets for a note with such unfavorable terms." *See* docket no. 124 (Memorandum containing findings of law and fact).

61.     Labovitz testified in a deposition on April 11, 2013, and again in sworn interrogatory responses on October 10, 2018, that he and Sharon Labovitz abandoned the Labovitz Note.

62.     The Labovitz Note, whether illusory or abandoned, was the vehicle for the fraudulent conveyance described above at paragraphs 46-51.

63.     Because the Labovitz Note was the vehicle for a fraudulent conveyance, pursuant to the Virginia fraudulent transfer statute at Va. Code Ann. §55.1-400 (formerly § 55-80), the Court should void the transfer of the Partnership Shares to the Trusts and rule that the Partnership Shares have always been the property of Peter and Sharon Labovitz.

64.     Because the Labovitz Note was the vehicle for a fraudulent conveyance and voids the transfer of the Partnership Shares to the Trusts, the Court should also disregard any subsequent transfers of the Partnership Shares between the Trusts and DCIA, including the sale of the Partnership Shares to DCIA in December 2000.

65.     The Trusts owned DCIA at the time of all transfers of Partnership Shares between the Trusts and DCIA.  The transfer of the Partnership Shares between them, on the basis of a $65,000 note that may never have been paid, was not for "valuable consideration" and under Va. Code Ann. §55.1-400 (formerly § 55-80) only title of a subsequent purchaser made "for valuable consideration" is recognized.

66.     In the December 2000 transfer of the Partnership Shares from the Trusts to DCIA, Labovitz, on behalf of DCIA, signed the paperwork that purported to transfer the Partnership Shares and, under Va. Code Ann. §55.1-400 (formerly § 55-80), the title of a purchaser, even one who paid valuable consideration, is not recognized  where "it appears [the purchaser] had notice of the fraudulent intent of [its] immediate grantor or of the fraud rendering void the title of such grantor."

67.     The Court should thus void the transfer of the Partnership Shares from the Labovitzes to the Trusts and from the Trusts to DCIA, and rule that the Partnership Shares remain the property of Peter and Sharon Labovitz.

**COUNT III: DECLARATORY JUDGMENT THAT THE COLLATERAL POOL LIEN AGAINST LABOVITZ'S RESIDENCE IS NO LONGER ENFORCEABLE BECAUSE IT HAS BEEN SATISFIED IN FULL, OR IN THE ALTERNATIVE, BECAUSE THE LIMITATIONS PERIOD FOR ENFORCING IT HAS EXPIRED UNDER VIRGINIA CODE § 8.01-242**

68.     The allegations contained in paragraphs 1– 67 are restated as if fully set forth herein.

69.     In the early 1990s, Peter Labovitz borrowed funds from friends and family (the "Original Lenders").  Labovitz executed multiple promissory notes to memorialize the loans (the "Promissory Notes").

70.     In order to collateralize the Promissory Notes, Labovitz entered a Collateral Pool Agreement, effective May 20, 1992, with the various note holders.  Under the Collateral Pool Agreement, Labovitz was to grant a security interest in favor of the Original Lenders against specified property of the Labovitzes that was to serve as collateral for the debts owed under the Promissory Notes.  This security interest shall be referred to in this complaint as the Collateral Pool Lien.

71.     Under the Collateral Pool Agreement, the Collateral Pool Lien was to encumber the Residence.  To place this encumbrance on the Residence, Labovitz executed a Deed of Trust on December 24, 1992, and recorded it in land records on October 26, 1993.

72.     The collateral subject to the Collateral Pool Lien also included a 12.28% Class B Interest in Gadsby Lodging Associates, LLC.  At the time, Gadsby Lodging Associates, LLC owned the Old Town Alexandria Holiday Inn Select, located at 480 King Street, Alexandria, VA 22314.

73.     The Class B interest in Gadsby Lodging Associates, LLC was transferred by Labovitz to the Trusts in February 1998 (as explained in Count II, this transfer was fraudulent) and then transferred from the Trusts to DCIA in December 2000.  Each transfer of the collateral, including the interest in Gadsby Lodging Associates, LLC, was made subject to the Collateral Pool Lien.

74.     The Collateral Pool Agreement required that if any of the underlying collateral was sold, the Original Lenders would be paid first from the sale proceeds.

75.     The Collateral Pool Agreement also stated that the obligations under it would terminate on December 31, 2010 if each of the Original Lenders' loans had been repaid in full.

76.     The Old Town Alexandria Holiday Inn located at 480 King Street was later sold on January 26, 2006, and Gatsby Lodging Associates, L.L.C. received approximately $55 million, with over $6.4 million of this corresponding to the 12.28% Class B Shares that had been transferred to DCIA in December 2000.

77.     In a separate transaction in 2006, some of the proceeds from the sale of 480 King Street were used to pay the Original Lenders the amounts they were owed under the Promissory Notes.

78.     Paying the Original Lenders in full, from the proceeds of selling collateral, is the definition of satisfying the debts underlying the Collateral Pool Lien.

79.     Thus, the beneficial interests in the Collateral Pool lien were not bought by DCIA. Rather, the Promissory Notes were paid and the Collateral Pool Lien was terminated.

80.     DCIA's tax returns for 2006 through 2010 did not list the beneficial interests in the Collateral Pool Lien as an asset of DCIA.

81.     The Collateral Pool lien was first listed as an asset of DCIA on DCIA's 2011 tax return, which was filed after the Government brought suit no. 12-cv-106 (E.D. Va.) on February 1, 2012, and issued discovery about Labovitz's financial dealings.

82.     Even then, for 2011, the Collateral Pool Lien was ascribed no value as an asset of DCIA.  Instead, the Collateral Pool Lien is given an estimated value of over $3 million as an asset of DCIA for the first time in its 2012 tax return.

83.     In 2022, for the first time, DCIA sought to foreclose on the supposed Collateral Pool Lien on Labovitz's residence and scheduled a nonjudicial foreclosure on this lien for February 11, 2022.  The foreclosure action was later withdrawn.

84.     The Court should declare that the Promissory Notes have been terminated and have no force and effect; and further that the Collateral Pool Lien on the Residence is terminated as well.

*Alternatively, the Collateral Pool Lien is Unenforceable against the Residence under Virginia Code § 8.01-242*

85.     Alternatively, the Collateral Pool Lien should be declared unenforceable as against the Residence under Virginia law.

86.     As explained in paragraphs 70 and 71, to encumber the Residence in conformance with the Collateral Pool Agreement, Labovitz executed and recorded a deed of trust in the land records.

87.     Pursuant to Virginia Code § 8.01-242, if the parties to a deed of trust omit the maturity date from the deed of trust itself, the deed of trust is only enforceable for 20 years.  The limitations period may be extended once for an additional period of 10 years if the beneficial owner of the property files a certificate of extension.

88.     The Deed of Trust for the Collateral Pool Lien did not list a maturity date.

89.     The Deed of Trust for the Collateral Pool Lien was executed on December 24, 1992 and extended once with a certificate of extension that was filed on February 1, 2012.

90.     Thus, the limitations period on collection for the Collateral Pool Lien expired on February 1, 2022.

91.     DCIA never demanded payment of either interest or principal on the Collateral Pool Lien until January 2022, when DCIA noticed a nonjudicial foreclosure action set for early

2022.  DCIA later withdrew the nonjudicial foreclosure action, and there is no collection action

by DCIA pending.

92.     Consequently, this Court should declare that the Collateral Pool Lien is

unenforceable as to the Residence under Virginia Law because the limitations period for

enforcing the associated Deed of Trust against the Residence has expired.

**COUNT IV: DECLARATORY JUDGMENT THAT THE ACCESS BANK NOTE IS NO LONGER ENFORCEABLE BECAUSE THE TIME TO ENFORCE IT HAS EXPIRED UNDER VIRGINIA CODE § 8.01-241, OR, IN THE ALTERNATIVE, BECAUSE THE NOTEHOLDER, DCIA, IS THE NOMINEE OF PETER LABOVITZ, OR, IN THE ALTERNATIVE, UNDER THE DOCTRINE OF SUBSTANCE OVER FORM**

93.     The allegations contained in paragraphs 1 – 92 are restated as if fully set forth

herein.

94.     On October 5, 2004, Access Bank and Peter Labovitz executed a promissory note

for $1,630,000 and corresponding deed of trust (collectively, the "Access Bank Note") to the

Residence, 510 Wolfe Street, Alexandria, Virginia.  The deed of trust was recorded in the

Alexandria land records as Instrument #040042151 on October 15, 2004, and re-recorded as

instrument #050002545 on January 27, 2005.

95.     Labovitz was unable to make the required payments to Access Bank.

Consequently, Labovitz, as president and sole officer of DCIA, directed DCIA to "purchase" the

Access Bank Note in 2007.

96.     Access Bank assigned the Access Bank Note to DCIA on October 28, 2007.

*The Access Bank Note is Unenforceable*
*under Virginia Code § 8.01-241*

97.     The Access Bank Note is no longer enforceable under Virginia law due to the

passage of time.

98.     The maturity date of the Access Bank Note was originally September 1, 2006.

99.     Pursuant to Virginia Code § 8.01-241, the note was enforceable for 10 years after the maturity date, that is, until September 1, 2016, though the period of enforceability could be extended once by a certificate of extension prior to September 1, 2016.

100.    A certificate of extension was filed on February 1, 2012.

101.    Under Virginia Code § 8.01-241, this extended the right to enforce the Access Bank Note for ten years from the date of the recordation of the certificate, that is, until February 1, 2022.

102.    Thus, the limitations period for enforcing the Access Bank Note expired on February 1, 2022.

*Alternatively, the Access Bank Note is unenforceable because it is held by Labovitz's nominee or is a façade of a debt under the doctrine of substance over form*

103.    Upon information and belief, Labovitz has exercised dominion and control over the Access Bank Note after it was "purchased" by DCIA. In particular:

    a.  Labovitz has control over the terms of payment.  Interest accrued on the Access Bank Note at 4.75% annually, and required monthly payments of interest, with a balloon payment of the remaining interest and principal on the Maturity Date that was September 1, 2016.  However, to the extent that Labovitz has made interest payments at all, he has made them only in November or December of each year, rather than monthly; Labovitz did not make a balloon payment of the remaining interest and principal on the Maturity Date of September 1, 2016, and Labovitz has never made any payments towards the principal balance.

17

b.  Similarly, Labovitz has control over whether DCIA will attempt to collect the unpaid amounts on the loan.  DCIA has not sought to renegotiate the terms of the Access Bank Note, including the Maturity Date of September 1, 2016; and DCIA has not taken any other steps to collect the unpaid balance on the Access Bank Note.

104.  The interest "payments" by Labovitz to DCIA towards the Access Bank Note have been circular in nature.  Labovitz does not receive enough income to make full interest payments on the Access Bank Note.  The "interest payments" by Labovitz have either been:

(1) a circular movement of funds where DCIA provides dividends to the Trusts, the Trusts distribute the funds to Sharon Labovitz, Sharon Labovitz provides the funds to her husband, and Labovitz pays DCIA the interest payments, and the cycle repeats itself; or

(2) reported as made to DCIA but with no funds exchanged between any individuals or entities, given that, according to Labovitz, the entity receiving the interest payments (DCIA) is owned by entities (the Trusts) that distribute income to Sharon Labovitz, so that interest "payments" to DCIA can simply be accounting entries reflecting distributions from the Trusts to Sharon in that amount.

105.  DCIA has not attempted to impede Labovitz's full use and enjoyment of the Residence in any way, despite Labovitz's ostensibly increasing debt to DCIA under the Access Bank Note.  Labovitz and his wife reside at the residence, receive rents from the Residence, and pay all expenses.

106.  Labovitz and his wife Sharon benefit greatly from the Access Bank Note and the "lien" created by the Note.  The Access Bank Note ostensibly creates a higher-priority

encumbrance on the Residence which will never be paid down, which does not require payment under its terms, and which will never be foreclosed upon.  This insulates Labovitz from bona fide creditors like the United States, by creating a supposed lien that leaves little equity available to bona fide creditors.

107.    In addition, for the reasons set forth in Count I, above, DCIA is owned 100% by Labovitz for purposes of this collection action and thus Labovitz retains full control and ownership over the entity that supposedly has a lien against his Residence.

108.    For all the foregoing reasons, the Court should declare that DCIA is the nominee of Peter Labovitz with respect to the Access Bank Note.

109.    Alternatively, since DCIA "purchased" the Access Bank Note, it has not acted as a creditor holding a note would act and the Access Bank Note should be disregarded under the doctrine of substance versus form of debt instruments and/or as a sham transaction.

110.    Either under the nominee doctrine or under the doctrine of substance over form or sham transactions, the Access Bank Note is no longer enforceable against the Labovitz Residence.

**COUNT V: DECLARATORY JUDGMENT THAT THE TRUSTS ARE THE NOMINEES OF PETER LABOVITZ WITH RESPECT TO THE NVR NOTE AND THE NVR NOTE IS NO LONGER ENFORCEABLE**

111.    The allegations contained in paragraphs 1-110 are restated as if fully set forth herein.

112.    On November 9, 1990, NVR Savings Bank FSB and Peter and Sharon Labovitz executed a home equity line of credit for $500,000 and corresponding deed of trust (collectively, the "NVR Note") to the Residence.  The NVR Note was recorded in the Alexandria land records as Instrument #040042151 on December 3, 1990, in Deed Book 1314, page 1162.

19

113.    Rather than simply paying back the NVR Note in full, Labovitz directed the Trusts to "purchase" the NVR Note from NVR Savings Bank FSB in 1994. NVR Savings Bank FSB assigned the NVR Note to the Trusts on March 10, 1994.

114.    When Labovitz directed the Trusts to "purchase" the NVR Note, Labovitz was aware that DCI Publishing, Inc. had multiple unpaid federal employment tax liabilities, and that he could face personal liability on account of those unpaid tax liabilities. Labovitz also owed federal income taxes for 1993 at the time.

115.    Upon information and belief, Labovitz exercised dominion and control over the NVR Note since it was "purchased" by the Trusts. In particular:

a.    Labovitz has had control over the terms of payment. Interest accrued on the NVR Note between 8% (at a minimum) and 14.75% (at a maximum), depending on the "prime rate" published in the "Money Rates" section of the Wall Street Journal. The terms of the credit agreement include minimum monthly payments.

b.    Since the Trusts purchased the NVR Note, Labovitz has either made nominal payments on the NVR Note, or none at all. Upon information and belief, from 1994 to 2012, Labovitz made no payments of interest or principal to the Trusts on the NVR Note. Since 2012, the Trusts have only reported receiving the minimal imputed interest for below-market loans. Imputed interest is the amount that, for federal tax purposes, the Trusts are treated as receiving in a year, even though they did not actually collect that amount.

c.    Similarly, Labovitz had control over whether the Trusts will attempt to collect the unpaid amounts on the NVR Note. The Trusts have not sought to renegotiate the

terms of the NVR Note, and the Trusts has not taken any other steps to collect the unpaid interest or principal.

116.    The Trusts have not attempted to impede Labovitz's full use and enjoyment of the Residence in any way, despite Labovitz's ostensibly increasing debt to the Trusts under the NVR Note.  Labovitz and his wife reside at the residence, receive rents from the Residence, and pay all expenses.

117.    Labovitz and his wife Sharon benefit greatly from the NVR Note and the "lien" created by the Note.  The NVR Note ostensibly creates a higher-priority encumbrance than the United States' liens on the Residence which will never be paid down, which does not require payment under its terms, and which will never be foreclosed upon. This insulates Labovitz from bona fide creditors like the United States, by creating a supposed lien that leaves little equity available to bona fide creditors.

118.    Sharon Labovitz, being both beneficiary of the Trusts and one of its trustees, has testified that, as an obligor on the NVR Note, it would not make sense for her to make payments to the Trusts under the Note.  Meanwhile, as she testified, it also did not make sense, as trustee of the Trusts, to demand payment from herself or Peter Labovitz toward the NVR Note.

119.    For all the foregoing reasons, the Court should declare that DCIA is the nominee of Labovitz with respect to the NVR Note.

120.    Alternatively, since the Trusts "purchased" the NVR Note, they have not acted as a creditor holding such a note would act and the NVR Note should be disregarded under the doctrine of substance versus form of debt instruments and/or as a sham transaction.

121.    Either under the nominee doctrine or under the doctrine of substance over form or sham transactions, this Note is no longer enforceable against the Labovitz Residence.

WHEREFORE, plaintiff, the United States of America, prays that this Court:

A.      Adjudge that the United States has valid and subsisting federal tax liens on all property and rights to property of Peter C. Labovitz.

B.      Adjudge that the property or rights to property of Peter C. Labovitz include:

   (i) an interest in the property at 510 Wolfe Street, Alexandria, Virginia;

   (ii) all shares in DCI Publishing of Alexandria, Inc.;

   (iii) a 45.1% limited partnership interest in Station Center Associates Limited Partnership; and a 99% limited partnership interest in Dechantal Associated Limited Partnership (collectively "the Partnership Shares");

C.      Adjudge that the transfer of the Partnership Shares to the Trusts was a fraudulent conveyance;

D.      Adjudge that the United States has a valid and subsisting judgment lien on the real property at 510 Wolfe Street, Alexandria, Virginia.

E.      Adjudge that the liens of the United States against 510 Wolfe Street are prior and superior to any security interest arising from the Access Bank Note, the NVR Note or the Collateral Pool Lien;

F.      Award to the United States its costs of prosecuting this action; and

G.      Order such further relief as the Court deems just and equitable.

DATE: July 14, 2023

JESSICA D. ABER
United States Attorney

By:    */s/ Gerard Mene*
GERARD MENE
Assistant U.S. Attorney
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3777
Facsimile:  (703) 299-3983
E-Mail: Gerard.Mene@usdoj.gov

DAVID A. HUBBERT
Deputy Assistant Attorney General

By:    */s/ Nishant Kumar*
NISHANT KUMAR  (D.C. Bar. No 1019053)
KIERAN CARTER   (VA Bar no. 81953)
Trial Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 227
Washington, DC 20044
Tel.: (202) 532-3567
Fax: (202) 514-6866
Emails: Nishant.kumar@usdoj.gov
        Kieran.o.carter@usdoj.gov

23